STATE of Missouri,
Plaintiff-Respondent,

v.

Lawrence Wayne BYRNE,
Defendant-Appellant.

No. 39549.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 26, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 15, 1980.

Application to Transfer Denied
April 8, 1980.

William J. Shaw, Public Defender, Daniel L. McCleave, Robert A. Cosentino and Frank Anzalone, Asst. Public Defenders, Clayton, for defendant-appellant.

Jerrold H. Chapnick, Asst. Pros. Atty., Carondelet, George R. Westfall, Pros. Atty., Clayton, John Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

Defendant appeals a jury conviction of murder in the first degree, attempted robbery first degree, armed criminal action, and assault with intent to kill with malice. Because the Second Offender Act, § 556.-280, RSMo 1969, was applicable the court sentenced defendant. Punishment was assessed at life imprisonment for murder in the first degree, five years for attempted robbery, fifteen years for armed criminal action and life for assault with intent to kill with malice aforethought.

Arthur and Marjorie Zbaren have operated the Horstmeyer Jewelry Store at 7246 Natural Bridge for 27 years. At about 10:30 on the snowy morning of January 6, 1977, a man with a cane entered the store and asked Mrs. Zbaren to show him watches that would be suitable for his young son.

As it was not customary for Mrs. Zbaren to show watches she called her husband to the front of the store where the watch display case was located. Upon her husband's arrival, Mrs. Zbaren went to the back of the store. Mr. Zbaren displayed a number of watches to this customer but the latter did not seem interested. The man with the cane then asked to see rings for his wife. Mr. Zbaren took two trays of rings from the safe and brought them to the counter for the customer's perusal. Here again the customer seemed disinterested.

At approximately 10:45 a. m., Arthur Ehrhard and another entered the store. Mr. Ehrhard had come to pick up a watch that the Zbarens' had repaired. The defendant walked immediately to the rear of the store. Suddenly, the man with the cane fell to the floor as if injured. While he was on the floor another customer, Mrs. Hall, entered the store. After Mr. Zbaren and Mr. Ehrhard helped this man stand up they heard Mrs. Zbaren call from the rear of the store, "Art, we have a problem." The two men turned and saw defendant pointing a gun at Mrs. Zbaren. The man with the cane was now also displaying a gun. Defendant then ordered all the occupants of the store to the rear of the building. He ordered the four not to look at his face and to stare directly at a display case while he frisked them for weapons. Upon being satisfied that they were not armed defendant ordered Mr. and Mrs. Zbaren, Mrs. Hall and Mr. Ehrhard to proceed to the basement. As Mrs. Zabren walked down the steps to the basement she was able to activate a silent hold-up alarm. Once in the basement the four captives were instructed to sit on the floor. Upon sitting, defendant taped each person's hands behind his or her back. Defendant then returned upstairs. Within seconds Mr. Zbaren freed himself and untied the others.

The silent alarm had alerted Normandy Police officers that the Horstmeyer Jewelry Store was being held-up. Officers Robert Hoelzel and Graham Burnley responded in separate cars. Officer Hoelzel arrived first. As Officer Burnley pulled into the parking lot, he saw Officer Hoelzel standing in the

doorway of the jewelry store holding the door open. Officer Hoelzel called out to Officer Burnley, who had parked his automobile a short distance away, that he should alert the police dispatcher that the hold-up signal was a false alarm. Officer Hoelzel then entered the store. Officer Burnley cancelled the hold-up alarm and proceeded to the front door of the jewelry store. Still under the assumption that he had responded to a false alarm, Officer Burnley held the door open while defendant's accomplice, the man with the cane, exited. As this man left, Officer Hoelzel called out to his partner, who was still near the store's front door, "Watch out Graham, he has a gun." Officer Burnley's attention was immediately drawn to the rear of the store where he saw defendant with a gun. Officer Hoelzel reached for his service revolver. Almost immediately defendant started firing.

Officer Burnley quickly returned to his police cruiser and advised the dispatcher he needed assistance. As Officer Burnley looked back at the jewelry store he saw defendant standing at the door. Defendant then fired a shot at the policeman and began running. Officer Burnley responded by firing three shots. One of these shots hit defendant in the left side of his chest. The defendant ran to the end of the building, turned the corner, so as to be headed south, and was out of the policeman's sight. Officer Burnley did not pursue defendant. Instead he went inside the store and found Officer Robert Hoelzel fatally shot in the head.

Defendant's first contention is that the trial court erred in admitting the handgun. Defendant argues that the gun was inadmissible because it was the "poisonous fruit" of an improper custodial interrogation conducted before defendant had been advised of his *Miranda* rights.

The evidence shows that when Officer Burnley radioed for help Officer William Dee of the City of Wellston Police Department answered. Officer Dee was a canine handler and had two dogs in his possession. Upon arriving, Officer Dee took his dogs to the rear of the store to search for defendant's scent. After locating an area of blood covered snow the dogs proceeded in a southerly direction. The dogs hesitated at 7237 St. Andrews Place, indicating that the track had ended. Defendant had in fact stopped at 7237 St. Andrews Place and forced his way into the residence. This was the home of Mrs. Evande Ferrario, an elderly woman. Defendant was seriously wounded and had lost a great deal of blood. About thirty minutes after his arrival, defendant ordered Mrs. Ferrario to call an ambulance. Mrs. Ferrario complied. Captain Terry Milam, of the City of Northwoods Police Department, was immediately apprised of the request for an ambulance and proceeded directly to Mrs. Ferrario's residence. Upon arrival he was met by Chief Pirrone and Officers Dee and McBridge and Sergeant Hicks. Those policemen suspected the injured person at 7237 St. Andrews Place to be the defendant.

Captain Milam joined by Officers McBridge and Pirrone approached the front door of Mrs. Ferrario's home. When the three policemen knocked, Mrs. Ferrario answered the door. Captain Milam rapidly asked her a series of questions: "Is there someone hurt within the residence?" She nodded "Yes." "Do you know this person?" She shook her head "No." "Is he shot?" "Yes," she nodded. "Does he have a gun?" "Yes," she nodded. The woman was quickly placed in a position of safety away from the house and the police officers entered. Defendant was hiding in the kitchen. After the policemen identified themselves and ordered defendant to come out with his hands up the defendant moved into the kitchen doorway and fell backwards into the kitchen. Defendant collapsed due to shock and loss of blood. Defendant was immediately handcuffed and told he was under arrest. Officer Milam began advising defendant of his constitutional rights. The officer informed defendant of his right to remain silent but discontinued the warning because the officer believed that defendant was in shock, and therefore not capable of comprehending what was being said. The officer then asked defendant

twice where the gun could be found. Defendant responded "Under a cookie dish." The officer went to a nearby table, raised a cake pan and found a .357 magnum. The gun was later identified as the weapon used to fatally wound Police Officer Robert Hoelzel.

At trial, the court sustained defendant's motion to suppress his statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the court denied defendant's motion to suppress the product of those statements, the handgun found under the cake cover. Defendant argues that the gun, and all evidence relating to it, should have been excluded under the fruit of the "poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The *Miranda* decision mandates that a person be appraised of his Fifth and Sixth Amendment rights prior to a "custodial interrogation." An individual is in custody when he had been deprived of his freedom of action. *Orozco v. Texas*, 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311 (1969). In the instant case there is no doubt defendant was in custody, he was handcuffed and informed he was under arrest. Thus, defendant was due a full reading of his Fifth and Sixth Amendment rights prior to being questioned. It is well settled that a statement made in violation of *Miranda* and evidence obtained as a result of that illegality is inadmissible. *Miranda v. Arizona*, 384 U.S. at 479, 86 S.Ct. at 1630. However, it is also firmly established that evidence seized as a result of impermissible police conduct does not "become sacred and inaccessible." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Thus exceptions to the exclusionary rule have been recognized. One such exception is that evidence may be admissible, despite

police misconduct, if the causal connection between the illegality and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). A second exception is that the exclusionary rule has no application when knowledge of the illegally obtained evidence is gained from a source independent of the illegality. *Silverthorne Lumber Co. v. United States*, supra. A third exception that many courts have applied is that illegally obtained evidence is admissible if the State can prove that the evidence inevitably would have been acquired without the illegal police conduct. *United States v. DeMarce*, 513 F.2d 755 (8th Cir. 1975); *Government of Virgin Islands v. Gereau*, 502 F.2d 914 (3rd Cir. 1974), cert. denied, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Gissendanner v. Wainwright*, 482 F.2d 1293 (5th Cir. 1973); *United States v. Seohnlein*, 423 F.2d 1051 (4th Cir. 1970), cert. denied, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Somer v. United States*, 138 F.2d 790 (2nd Cir. 1943); *United States v. Kelley*, 414 F.Supp. 1131 (W.D.Mo.1976), rev'd on other grounds, 547 F.2d 82 (8th Cir. 1977). Neither the United States Supreme Court nor the Supreme Court of Missouri has expressly accepted the "inevitable discovery" exception to the exclusionary rule.

The inevitable discovery exception has been a source of controversy because of the belief held by some critics that it would erode the exclusionary rule as a viable deterrent to illicit police activity.[1] It is argued that this erosion would result because the inevitable discovery exception "results in a speculative theory with no discernable limits"[2] which would "encourage police shortcuts whenever evidence could be more readily obtained by illegal than legal means."[3] These concerns are genuine and

1. *People v. Payton*, 45 N.Y.2d 300, 408 N.Y. S.2d 395, 404, 380 N.E.2d 224, 233 (1978) (Wachtler J., dissenting). See generally 3, La Fave, Search and Seizure, 622 (1978).

2. *People v. Fitzpatrick*, 32 N.Y.2d 499, 513, 346 N.Y.S.2d 793, 802, 300 N.E.2d 139, 146 (1973)

(Wachtler J., concurring), cert. denied, 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338.

3. The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Colum.L.

ought not be readily dismissed. However, we believe the inevitable discovery rule may safely be applied and erosion of the exclusionary rule avoided. This can be accomplished by applying the inevitable discovery exception only where the state has proved by clear and convincing evidence that:

1. The state *would* have acquired the evidence through legal means regardless of illegality and

2. The police officers involved did not act in bad faith to accelerate the discovery of the evidence.[4]

We are convinced to adopt this exception because, if properly administered, it serves the underlying policy of the exclusionary rule by denying admission of evidence obtained by exploitation of illegal police conduct.[5] At the same time the exception minimizes the opportunity for the defendant to receive the undeserved and socially undesirable windfall of excluding relevant evidence of great probative value which is otherwise admissible,[6] or as it has been said of an accused subject of an illegal search that he "is entitled to be as well off as if [law enforcement authority] had not unlawfully seized [evidence], but he is not entitled to be any better off." *Lord v. Kelley*, 223 F.Supp. 684, 691 (D.Mass.1963), appeal dismissed 334 F.2d 742 (4th Cir. 1964), cert. denied 379 U.S. 961, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965).

■ Applying the inevitable discovery exception to the case before us, the defendant was clearly not entitled to have the gun suppressed. First, the evidence is convincing that the officers arresting defendant *would* have uncovered the gun regardless of defendant's illegally elicited statements. This finding is substantiated by the fact that the officers knew defendant was armed.

The weapon employed in a robbery and a shooting of [a police officer], is a prime object of any investigation and, unless thrown away, was certain to be either on or near the defendant. If not found upon him, the next most *reasonable* place to look for it was where he had been just before he was seized. *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 797, 300 N.E.2d 139, 142 (1973), cert. denied, 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338.

A search of the kitchen and discovery of the gun was inevitable because the police found defendant hiding in the kitchen. Further, the arresting officer testified that he *would* have searched the dinette on which the cake cover concealing defendant's gun rested. This testimony is borne out and buttressed by the fact that the dinette's table cloth was blood stained and defendant's black gloves were on the table only inches from the cake cover. The State also established that the Officers did not act in bad faith to accelerate discovery of the weapon. There was ample and sufficient evidence that the officers acted to protect themselves. The officers seized the gun for their self-protection because they knew two men had been involved in the robbery and murder, but only one was found. The police also had no way of knowing whether other, unknown accomplices were lying in waiting with the gun. Thus the second prong of the above test has been met.

Defendant's second contention is that the trial court erred in ordering him to appear in a lineup clean shaven. The evidence shows that a Grand Jury for St. Louis County returned an indictment against defendant on February 14, 1977. At this time defendant wore a full beard. On March 4,

Rev. 88, 99 (1974); Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579, 630 (1968); *People v. Gonzalez*, 39 N.Y.2d 122, 131, 347 N.E.2d 575, 582, 383 N.Y.S.2d 215, 221.

**4.** *People v. Kusowski*, 403 Mich. 653, 272 N.W.2d 503, 512 (1978).

**5.** See, *People v. Superior Court of Alameda County*, 80 Cal.App.3d 665, 145 Cal.Rptr. 795

(1978) for an extensive and detailed discussion and examination of the development and propriety of this rule.

**6.** Maguire, How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Ruling, 55 J.Crim. L.C. & P.S. 307, 313–317 (1964).

1977, the state made a motion to compel defendant to appear in a lineup clean shaven. A hearing was held and arguments on the motion were heard before the trial judge, the Honorable Orville Richardson, on March 10, 1977. At that hearing the assistant prosecuting attorney testified that: (1) The subject who allegedly participated in the murder and attempted robbery was described as clean shaven. (2) The hospital personnel who attended defendant following his arrest would testify that he was clean shaven at that time. (3) Police photographs taken shortly after defendant's arrest show him as being clean shaven. On March 11, 1977, the trial court entered an order sustaining the State's motion to compel defendant to shave. On March 23, 1977, a lineup was conducted; appellant was identified by all four witnesses who were shown the lineup.

Defendant argues that the trial court's order violated Rule 25.35 and the Fifth Amendment to the Constitution of the United States.

■ Defendant bases his contention on an incorrect reading of Rule 25.35. That rule in pertinent part provides:

(B) Upon motion by the state, and subject to constitutional limitations and any other safeguards deemed appropriate by the court, and upon a showing of good cause, the court may order the defendant to:

(1) Appear in a lineup;

(2) Speak for identification;

(3) Be fingerprinted;

(4) Pose for photographs not involving reenactment of a scene;

(5) Try on articles of clothing;

(6) Provide a sample of his handwriting;

(7) Submit the taking of specimens of material under defendant's fingernails;

(8) Submit to the taking of samples of the defendant's blood, hair, and other materials of his body, which involve no unreasonable intrusion thereof;

(9) Submit to a reasonable physical or medical inspection of his body.

Defendant argues that the above rule was violated because it does not explicitly provide that defendant could be ordered to shave before appearing in the lineup. This argument is without merit. As we read the rule a trial court, upon a showing of good cause, may order a defendant to appear in a lineup "subject to constitutional limitations . . . ." Defendant does not contest the State's showing of good cause. However, he does argue that his Fifth Amendment privilege against self-incrimination was violated. This contention is also without merit. "It has long been held that the compelled display of identifiable *physical characteristics* infringes no interest protected by the privilege against compulsory self-incrimination." *United States v. Dionisio*, 410 U.S. 1, 5–6, 93 S.Ct. 764, 767, 35 L.Ed.2d 67 (1973) (emphasis added). See also *State v. Proctor*, 535 S.W.2d 141, 144 (Mo.App. 1976). Defendant was merely compelled to display his face as it appeared when arrested.

In his third point on appeal defendant argues that the trial court erred in overruling defendant's motion to strike the jury panel. Defendant contends that the jury panel was improperly influenced and should have been discharged because during voir dire examination the judge made the following remarks:

[THE COURT:] Now, I will determine later on, as the Judge in the case, whether or not the jury will be asked to determine punishment if the jury finds him guilty on any of these charges . . . . I have only one question of you now. The punishment after a finding of guilt for murder in the first degree is confinement by the Department of Corrections for life, but without probation or parole or eligibility for it until the person has served 50 years, subject to any constitutional exercise of clemency.

(Following a brief exchange with defense counsel the court continued).

THE COURT: Subject to the exercise of any right of executive clemency by the governor . . . is there any one of you who feels that he cannot or could not

under any circumstances vote for the punishment or imprisonment of someone found guilty of a crime? All right. Is there any one of you who feels that under no circumstances could he ever vote for punishment for murder in the first degree by an imprisonment for life without eligibility for probation or parole for 50 years, subject however to the exercise of the governor's right of clemency?

Any one of you that feels under the circumstances could you assess such a punishment for murder in the first degree if the person of course is found guilty if you were asked to pass upon that? I assume by your silence that none of you feel that way. (Tr. 255–256).

The record indicates that the above comments were made after the judge met in camera with both counsel for the defendant and the state. At this meeting defense counsel wanted the judge to tell the jury that punishment for murder in the first degree was life imprisonment without the possibility of parole or probation for 50 years. The state objected to such a comment. The trial judge felt, at that time, that if the jury panel was to be informed of the impossibility of parole or probation that it would only be fair to also·inform the panel of the possibility of executive clemency. Thus the judge made the above comments.

Following the judge's comments defense counsel made an objection to the judge's statements concerning executive clemency, he *did not* object to the statements concerning the lack of eligibility for probation and parole for 50 years. Later defendant filed a motion to strike the jury panel because of the comments concerning executive clemency. The trial court subsequently overruled defendant's motion. On June 30, 1979, the jury returned a verdict of guilty on all four counts charged. It was determined that defendant was subject to the Second Offender Statute, § 556.280, RSMo 1969, and punishment was therefore imposed by the court.

■ The trial court's statements regarding the possibility of executive clemen-

cy did not constitute prejudicial error. In so ruling this court is well aware of those authorities that have held it to be improper for a trial judge to instruct a jury during its deliberations that parole may be granted to decrease the sentence imposed by its verdict, *State v. Cornett*, 381 S.W.2d 878, 881 (Mo. banc 1964), or for a prosecutor to recommend, in final argument, that defendant should be given a heavy sentence because of the possibility of parole. *State v. Lewis*, 443 S.W.2d 186, 190 (Mo.1969). The validity of·these rules is not doubted. However, we feel the above rule is inapplicable where the complained of incident arose during the voir dire process. *State v. Francis*, 544 S.W.2d 306, 312 (Mo.App.1976). A trial court has broad discretion in the control and conduct of voir dire; an appellate court will not interfere with the exercise of that discretion unless it is manifestly abused and there is a real possibility of prejudice to the aggrieved party. *State v. Scott*, 515 S.W.2d 524, 527 (Mo.1974); *State v. Yowell*, 513 S.W.2d 397, 403 (Mo. banc 1974).

■ Like the court in *State v. Francis*, supra, we disapprove of trial courts informing veniremen of the likelihood of probation, parole or clemency. Such information is extraneous to a proper determination of guilt and punishment and should be of no concern to a jury or venire panel. *State v. Rollins*, 449 S.W.2d 585, 591 (Mo.1970).

■ Concerning the trial judge's comments on probation and parole, the defendant has failed to preserve this issue for appellate review. An examination of the record indicates that defendant did not object to these statements at the time they were made, further they were included in neither his motion to discharge the jury panel, nor in his motion for new trial. Therefore, we need not review this allegation of error. *State v. Harris*, 534 S.W.2d 516, 519 (Mo.App.1976). Furthermore, assuming this point on appeal was properly before us we would rule against defendant. The record shows that the court's remarks were made at the request of defendant's counsel. Thus, any error that was commit-

ted was invited by defendant and will not be corrected by granting a new trial. *State v. McGee*, 361 Mo. 309, 234 S.W.2d 587, 592 (Mo. banc 1950). In the present case the court's remarks constitute harmless error because defendant has failed to establish that they prejudiced him in any manner. These comments in no way indicated the judge's personal belief that defendant was guilty. The state presented an overwhelmingly convincing case supporting all four criminal violations charged. Further, since the Second Offender Act was applicable the jury did not assess punishment.

Defendant's final contention is that the trial court erred in allowing the prosecutor, over defendant's timely objection, to elicit testimony that the serial numbers of the seized handgun were obliterated by drill marks. Defendant argues this evidence was inadmissible because it constituted "improper references to the commission of a separate and distinct crime . . . totally unrelated to the charges for which [defendant] was on trial. . . ."

■ It is true, as defendant contends, possession of a pistol which can be concealed upon the person without a legible serial number stamped on it is a criminal offense. § 571.130 RSMo (1978). Such an offense carries a maximum punishment of five years imprisonment. § 571.140 RSMo (1978). Generally, evidence of a separate and distinct crime is not admissible unless it tends to establish defendant's guilt of the crime for which he is being tried. *State v. Granberry*, 530 S.W.2d 714 (Mo.App.1975). However, this rule is subject to exceptions which allow admission of evidence of separate and distinct crimes when:

> it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (Mo. banc 1954).

The acid test for determining whether proof of a separate and distinct crime falls within any of these exceptions is its logical relevancy to a particular exception and its tendency to prove a material fact in issue. *State v. Frazier*, 550 S.W.2d 590, 596 (Mo. App.1977).

■ This court concludes that the evidence that the serial number of the seized handgun had been defaced was admissible because the crime of possessing a gun without the proper serial number was so closely related to the crime for which defendant was on trial that proof of the latter tends to establish proof of the former. The material fact which the state sought to establish by eliciting the testimony that the gun's serial number had been removed by drilling was that the gun in court was the same gun taken from defendant. Thus, in eliciting the testimony the state was attempting to meet its burden of establishing the chain of custody. The drill marks, a physical characteristic peculiar to this gun, served as a means for the seizing officers and their counterparts in the police laboratory to identify the gun while in court. Quite simply, because defendant used a gun with defaced serial numbers to commit the crimes for which he was tried renders the facts and circumstances of both offenses to be "so interrelated that the crimes are concurrent, proof of one cannot be made without a showing of the facts tending to establish the other." *State v. Parr*, 296 Mo. 406, 246 S.W. 903, 905 (1922). Under these circumstances the court was not required to sift the evidence in order to delete any possible mention of crimes other than those charged. *State v. Morris*, 523 S.W.2d 329, 331 (Mo.App.1975). Thus the defendant must suffer the consequences of his own behavior, the evidence comes in. Judgment affirmed.

GUNN, P. J., and STEPHAN, J., concur.