STATE of Missouri,
Plaintiff-Respondent,

v.

James MAYES, Defendant-Appellant.

No. 45051.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 31, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied July 15, 1983.

Application to Transfer Denied
Aug. 16, 1983.

Toby H. Hollander, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Kelly Klopfenstein, Kris Green, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Judge.

James Mayes, hereinafter the appellant, appeals his conviction of robbery in the first degree, § 569.020 V.A.M.S. and a sentence of ten years imprisonment in the custody of the Missouri Department of Corrections imposed upon him in accordance with the verdict of a jury in the Circuit Court for the City of St. Louis.

Appellant initially challenges the sufficiency of the evidence to support the verdict and contends that the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence. The thrust of his argument is that the only evidence connecting him to the commission of the crime—eye-witness identification—is so insufficient and unsatisfactory that it fails to remove all reasonable doubt as to his guilt of the crime charged.

In deciding whether there is sufficient evidence to support a conviction the reviewing court must distinguish between the *weight* of the evidence and the substantiality of the evidence of the defendant's guilt. The weight of the evidence is for the jury if, but only if, the reviewing court can first say that there was substantial evidence of guilt to support the verdict of the jury. *City of Kansas City v. Oxley,* 579 S.W.2d 113, 116[4] (Mo. banc 1979); *State v. Harvey,* 641 S.W.2d 792, 799[6] (Mo.App. 1982); *State v. Talbert,* 524 S.W.2d 58, 59[1] (Mo.App.1975). We must, in each case, scrutinize the record to ascertain whether a finding of guilt was supported by substantial evidence. id. See also *State v. Gregory,* 339 Mo. 133, 96 S.W.2d 47, 51[4] (1936).

The phrase "substantial evidence" was analyzed by the Court in *Gregory,* supra, when it said:

"To amount to more than a scintilla, that is, to be substantial, it has been said: 'The evidence must be of a character sufficiently substantial, in view of all the circumstances of the case, to warrant the [trier of the facts] in finding from it the fact to establish which the evidence was introduced' [citing cases]. In other words, substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith." 96 S.W.2d at 52.

When this issue is properly presented, an appellate court cannot escape its responsibility by shifting it to the jury. *State v. Talbert,* supra, l.c. 59[2].

In determining the sufficiency of the evidence to support a conviction the reviewing court considers as true the evidence favorable to the state and the favorable inferences reasonably to be drawn therefrom, and evidence to the contrary is rejected; the Court's function is not to substitute its judgment for that of the jury but to determine only whether the evidence, considered in a light most favorable to the state and all inferences therefrom, disregarding evidence to the contrary, is sufficient to make a submissible case. *State v. Cain,* 507 S.W.2d 437, 438[1] (Mo.App.1974).

Viewing the evidence in this light, the jury could find that on the morning of December 12, 1980, sometime between 9:00 a.m. and 9:30 a.m. a black male waited in a check-out line at Mateker's Market, in the City of St. Louis, ordered and paid for a pack of Benson & Hedges cigarettes, and then pulled a small, shiny pistol and robbed Ralph Christman, owner-operator of the store of $143.00.

Officer Robert Schoenecker answered a call to Mateker's Market at approximately 9:30 a.m. where he spoke to Mr. Christman and Darryl Becker, a witness, on the scene. He also later spoke with Earlean Tharp, a witness to the robbery on the telephone. He received about the same description of the robber from these three witnesses.

This description was that the robber was "a negro male, approximately 20 to 23 years of age, approximately 6', 6' 2" tall, thin build, light colored jacket, dark pants, sunglasses, long sideburns and he was also wearing a baseball cap, black and yellow of the Pittsburgh type . . ."

The only state witness to make an in-court identification of the appellant as the robber was Earlean Tharp, and she testified that she was standing in the check-out line directly behind the robber when the robbery occurred. After the robbery she gave her name and telephone number to Mr. Christman and then went to her home. Approximately thirty minutes after the robbery police officers arrived at her apartment and showed her a series of photographs in an effort to ascertain the identity of the robber. Mrs. Tharp recognized appellant from one of the photographs shown to her as the man who robbed the store.

Almost two weeks after the robbery she viewed a pre-trial identification line-up conducted by the police in an effort to identify the robber. She identified the appellant as the man who robbed Mateker's Market at this identification line-up.

She testified in court that the robber was about 5'6", 5'7", taller than I were [sic] . . . because I'm 5'4" tall and gave his weight as "about a hundred thirty, forty" pounds. She stated the robber wore long side burns and had a goatee. She further acknowledged that during her deposition on May 8, 1981 she had compared the height of the robber with that of another customer standing in line at the same time by saying that the customer was about 6', much taller than the robber. When asked during deposition how the "mug shot" of defendant varied from the appearance of the robber, she said that the person in the picture was larger and his facial hair was cut shorter. She further testified that the robber's appearance varied from that shown to her in the "mug shot," because "he" had a bald head, but the testimony in the record is not clear whether she thought it was the robber or the person in the photograph who had the bald head. When asked in court whether she had told police that the robber was 6'2",

140 pounds and had long side burns she answered in the affirmative.

Mrs. Tharp also testified that she had seen the appellant once or twice prior to the robbery working in the Scarsdale Apartment complex which is adjacent to Mateker's Market. Her best estimate as to the time she saw him there was three or four months earlier during the summer. According to Mr. Christman the residents of the Scarsdale Apartments made up the major source of his business. He also testified that at the time of the robbery two persons were in line ahead of the robber and Mrs. Tharp was directly behind the robber. He described the robber as 20 to 23, no taller than 6'2", thin, with side burns to the bottom of his ears. Darryl Becker, an employee of the Scarsdale Apartments for seven years testified that he was waiting to cash his pay check when the robbery took place, and, although he had not been aware of the fact a robbery was taking place, he had seen the robber in line and could describe him. He also testified that he had seen James Mayes in the Scarsdale Apartment complex prior to the day of the robbery and he recognized him sitting in the court room. He could not however identify defendant as the robber.

On December 29, 1980,—seventeen days subsequent to the robbery—the police officers went to the appellant's home at approximately 11:45 p.m. to place him under arrest. The arresting officers had no warrant for the appellant's arrest. Appellant was removed from his home in handcuffs and held in custody over night. The next morning he appeared in a line-up at the police headquarters in downtown St. Louis. The police report prepared at the time appellant was booked described him as being 5'11" tall, 162 pounds, medium build, with a mustache and beard.

Appellant's defense was alibi. According to defendant and his witnesses he was at home with his family at the time of the robbery and talked with his employer about 9:15 a.m. that morning concerning the days work.

Appellant concedes that appellate courts in Missouri do not weigh identification testimony and that issue is the function of the jury. *State v. Timmons,* 584 S.W.2d 129, 132[1] (Mo.App.1979); *Eichelberger v. State,* 524 S.W.2d 890, 893[5] (Mo.App.1975). He cites no Missouri cases to the contrary. He, however, relies on *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) and articles from law books and law journals[1] attacking the vagueries of eye witness identification. He also cites two cases from our sister state of Illinois for the proposition that if an identification is so improbable or unsatisfactory that all reasonable doubt is not removed, it is the duty of the appellate court to reverse. *People v. Hister,* 20 Ill.App.3d 933, 314 N.E.2d 562 (1974) Aff'd 60 Ill.2d 567, 328 N.E.2d 531 (1975) and *People v. Gardner,* 35 Ill.2d 564, 221 N.E.2d 232 (1966). Appellant also argues that *Timmons* and *Eichelberger,* supra, are distinguishable because in each of those cases (1) there was evidence corroborating the identification of the defendant; (2) there was independent evidence of the defendant's guilt; (3) the descriptions of the perpetrator of the crimes given at the time of same match the physical appearance of the defendant on trial.

Unlike the Illinois appellate courts it is not the function or prerogative of the appellate courts of Missouri to weigh the evidence to determine whether a charge has been proven beyond a reasonable doubt; that is the function of the jury in this state. *State v. Smith,* 527 S.W.2d 731, 733[4] (Mo. App.1975). Nevertheless, our scope of review of a conviction in the trial courts of this state does extend to a determination of whether there is sufficient substantial evidence to support the verdict, *State v. Sherrill,* 496 S.W.2d 321, 323[2] (Mo.App.1973); or, stated in other terms, whether there is sufficient evidence from which reasonable persons could have found defendant guilty as charged. *State v. Turner,* 623 S.W.2d 4, 6[2] (Mo. banc 1981); *State v. Kelly,* 539 S.W.2d 106, 109[3] (Mo. banc 1976).

The prosecution offered the testimony of three eyewitnesses to the crime: Ralph Christman, Earlean Tharp, and Darryl Becker. Messrs. Christman and Becker never at any time identified appellant as the robber; only Mrs. Tharp did. It was Mr. Christman who was the victim of the crime and who had the opportunity to observe the robber under good lighting conditions for a period of 4 or 5 minutes while he stood in the check-out line, for a minute to a minute and a half during the course of the robbery while they were face to face as the robber stood directly across from him, and approximately ½ minute as the robber made good his escape.

Mr. Becker observed the robber as he stood in the check-out line, but he wasn't paying much attention. He did observe that the robber was a black male, wearing a baseball cap with yellow on it and dark clothes. He was "a big guy," with thin facial features. He "looked familiar" although he viewed the same photos as Mr. Christman and Mrs. Tharp, he could identify no one as the robber. He also attended the same line-up as did the other two eyewitnesses but he could not identify anyone in the line-up as the robber. Two of the men—one, the defendant—did look similar to the robber in height, weight and build.

Appellant's attack on the sufficiency of evidence hinges on the reliability of the testimony of only one of the three eye-witnesses, Mrs. Tharp, who "fingered" the appellant as the robber. He points out that when she was interviewed immediately following the robbery she described the culprit as being a negro male, 20 to 23 years of age, 6' to 6'2" tall, and thin build.[2]

1. 231 Scientific American, No. 6 pp. 23–31; Note "Did Your Eyes Deceive You?" 29 Stanford Law Review 969 (May, 1977); Wall, Eyewitness Identification in Criminal Cases (Charles C. Thomas, Publ.1965); and Loftus, Eyewitness Testimony, (Harvard U. Press, 1979).

2. One of the descriptions given to a police officer on the scene was a composite he got "from them" and contained more detail than Mrs. Tharp's testimony revealed.

■ The law is clear in this state that the testimony of a single witness *may* be sufficient to constitute substantial evidence to make a submissible case. *State v. Ball,* 622 S.W.2d 285, 291[17] (Mo.App.1981).

■ The critical question in identification cases is the reliability of the in-court identification, and in resolving this question the reliability of the in-court identification is to be assessed under the "totality of the circumstances." *State v. Higgins,* 592 S.W.2d 151, 160[13] (Mo. banc 1979). The factors to be considered include:

1) The opportunity of the witness to view the accused at the time of the commission of the crime;

2) the witness' degree of attention;

3) the accuracy of the witness' prior description of the accused;

4) the level of certainty demonstrated by the witness at the confrontation; and

5) the length of time between the crime and the confrontation.

*State v. Higgins,* supra, l.c. 160[13, 14]; *State v. Gates,* 637 S.W.2d 280, 285[10] (Mo. App.1982).

■ The law does not require that a witness' description be totally accurate. *State v. Radford,* 559 S.W.2d 751, 753[4] (Mo.App. 1977).

■ Applying the factors for gauging the reliability of an eyewitness' in-court identification of an accused to Mrs. Tharp's identification of appellant as the perpetrator of the robbery of Ralph Christman on the 12th of December, 1980, we conclude that the in-court identification of appellant was sufficiently reliable to make a submissible case.

Mrs. Tharp had an excellent opportunity to observe the robber both prior to and during the perpetration of the robbery. This was a day-light robbery, in a well lighted grocery store. The robber did not have his face masked, and according to Mrs. Tharp's testimony she observed him among a group of people approaching the check-out counter. He was the only black male in

the store and was about 5 feet away. She saw his face, his build, and his clothing. She was standing in line at the check-out counter next to him for 3 or 4 minutes before the robbery took place. The robbery consumed approximately 5 minutes, and during this time she could see the left side of the robber's face and at one point in the course of the robbery he looked at her "face on." She observed him in the grocery store for a total of approximately 15 minutes.

Later the same day, when she was visited at her apartment by detectives of the St. Louis Metropolitan Police Department she described the robber as follows: 6'2" tall, weighing 140 pounds, thin build, long sideburns, a small mustache, wearing sunglasses, a light colored jacket, dark pants, and a black and yellow Pittsburgh style baseball cap.

The detectives also displayed to her a number of photos. From among these photos she selected appellant's picture as the picture of the robber.[3] She had seen appellant around the housing complex on two prior occasions.

Approximately two weeks later, from a line-up, she identified appellant as the robber.

At trial, during direct examination, Mrs. Tharp described the robber as a black man, 5'6" to 5'7" tall—"taller than I am, because I'm 5'4" tall"—weighing 130 to 140 pounds; he wore long sideburns which came 2" to 3" below his ears, had a goatee, a small mustache, and was wearing a light jacket, blue-jeans and a baseball cap. She was certain appellant was the robber. On cross-examination she repeated the description she'd given of the robber to the detective shortly after the robbery.

Appellant contends the following inconsistencies in Mrs. Tharp's testimony in deposition and at trial renders her identification of the appellant as the robber void of any substance:

---

**3.** On the hearing to suppress identification Mrs. Tharp testified with respect to this photo display that in selecting this picture she did not

positively identify the man pictured therein as the robber, he sort of looked like the robber and said "I did the best I could."

1) the same morning of the robbery she described the robber as being 6'2" tall—at trial, as 5'6" to 5'7" tall; [4]

2) she described another customer in the store at the time of the robbery as being about 6 feet tall—much taller than the robber who was standing next to her in the check-out line, (this man was white);

3) she described the sideburns on the robber extending 2 to 3 inches below his ears;

4) she described a goatee in the area of the chin but on cross-examination described the goatee as being beneath the lower lip;

5) her identification of appellant for the pre-trial photo display was tentative—on cross-examination, using her deposition, she admitted:

(a) that the person depicted in the photo was larger than the robber;

(b) that the person in the photo had a bald head; and,

(c) the facial hair of the person in the photo "was cut too short."

According to the arresting officer, appellant, at the time of his arrest on December 29, 1980, was 5'11" tall, weighed 162 pounds, of medium build, with a mustache and a beard. He could not have been 5'6" tall nor weigh 130 pounds.

Appellant, testifying in his own behalf testified he was 30 years of age at time of trial in October, 1981, and on the date of the robbery was 5'11" tall and weighed 162 pounds.

Appellant also argues that Mrs. Tharp's descriptions of the robber not only conflict with each other, but also conflict with descriptions given by the other eye witnesses concerning the robber's height—6'2" tall—his weight—140 pounds—his build—thin—and his age—20 to 23.

Mr. Christman testified that the robber's only facial hair was sideburns which extended to the bottom of his ears.

Applying this evidence to the reliability criteria of *State v. Higgins,* supra, the evidence demonstrates that Mrs. Tharp had an excellent opportunity to view the accused at the time of the commission of the crime with a degree of attention. Her description of the robber given to the police was off by 4 inches in height and approximately 20 to 30 pounds in weight; and while she described him as being of "thin" build, the arresting officer said he was medium build. The most devastating variance in Mrs. Tharp's description of the robber, given at trial, was that the robber was 5'6" to 5'7" tall, 4 to 5 inches shorter than the estimate of the arresting officer and appellant's testimony that he was 5'11" tall. This discrepancy between her prior description of the robber as 6'2" tall—a 3 inch difference—was not explained nor accounted for.

While there was some hesitance in selecting appellant's picture from the array of photos, she did so, and eighteen days subsequent to the robbery picked him out of a line-up of four men as the robber without any hesitancy. At trial she positively identified appellant as the robber.

In *State v. Sanders,* 621 S.W.2d 386, 389 (Mo.App.1981), a prosecution for rape and first degree robbery, inconsistencies between the victim's description of the accused and his actual physical characteristics were held not to render the victim's identification testimony inadmissible where it satisfied four of the five factors enunciated in *State v. Higgins,* supra. These inconsistencies in *Sanders* were: (1) the accused was two or three inches shorter than her original description, (2) he had neither a round face nor was he dark complexioned, and, (3) according to the police report the victim reported the rapist wore glasses, but she

4. Appellant cites, as an item of Mrs. Tharp's description to the detective, that the robber was 20–23 years of age. She did not say that she estimated his age in those terms. On cross-examination she was asked if she described the robber in those terms and her response was: "Possibly." This is hardly an admission. The detective who obtained the description testified he obtained descriptions from the three eyewitnesses and the descriptions were approximately the same.

denied stating this to the police officers when she reported the crime.

Although *Sanders* did not specifically concern itself with whether there was substantial evidence to support the conviction, it is persuasive on what effect inconsistencies in an eye-witness' testimony satisfy the *Higgins* factors.

In *State v. Hayes,* 624 S.W.2d 488, 489[2] (Mo.App.1981), a robbery second degree prosecution, the victim, shortly after the incident and according to her testimony gave a policeman the following description of the robber: white male about 5'7" in height, 135–145 pounds in weight, slender of stature and with the dark complexion of either a Mexican or an Indian. According to the police officer she described the robber as a white male, 18–20 years old, 5'6" to 5'8" in height, 120 pounds in weight, slender of stature, dark complexion and black shoulder length hair. The victim also testified that she described the facial features of the assailant but the officer had no recollection of this, and his report indicated the hair of the suspect as brown rather than black. Eleven days after the event the victim promptly identified one likeness from an array of photographs as the man who robbed her and, the next day, identified the defendant from a line-up of three males as the robber. In refuting the defendant's attack on the integrity of the pre-trial identification procedures and the sufficiency of the in-court identification, the court, 624 S.W.2d l.c. 489, said: ". . ., the trial identification by the victim had the marks of reliability."

In *State v. Hill,* 438 S.W.2d 244, 248[7, 8] (Mo.1969) the prosecuting witness, and only eyewitness, in a robbery prosecution gave a description of the robber to a policeman immediately following the robbery. According to this description the robber was "a negro male, about 27 years old, 4'9" tall and wearing a heavy mustache, goatee, black hat, black trench coat and gold shirt." Defendant, who was taken into custody four days after the robbery, was at least a foot taller than described by the victim and had no goatee. He did, however have a mustache and was wearing clothing described by the victim as being worn by the robber.

In ruling on the defendant's contention that the trial court erred in denying his motion for judgment of acquittal at the close of all of the evidence because the testimony of the victim was contradictory and inconsistent, and the identity of the defendant by the victim at the police station was unreliable, the court, 438 S.W.2d l.c. 248[8] said: "Discrepancies in the description given by Simpson [the victim] to Officer Condon were developed at trial and were matters for consideration by the jury in determining Simpson's credibility and the weight to be given his testimony. [citations] They were not so self-destructive as to render the state's evidence insufficient as a matter of law."

For other cases where there have been inconsistencies in the testimony of the victim and the actual physical characteristics of a defendant, but, nonetheless, the identification was held to be reliable so that it was a sufficient basis for the victim's identification and support a conviction, see: *State v. Jones,* 643 S.W.2d 34, 36 (Mo.App. 1982), victim described robber as 5'11" to 6' tall whereas the defendant was, in fact, 6'2" tall; *State v. Gates,* 637 S.W.2d 280, 284[6] (Mo.App.1982), where victim initially described the defendant as "tall," and on a subsequent interview eight days later as "short," whereas, as a matter of fact the defendant was 6'2" tall; *State v. Radford,* 559 S.W.2d l.c., 751, 753[5] (Mo.App.1977), where victim described robber to police as being 5'10" to 5'11" tall, where, in fact, the defendant was 6'6" tall.

On the whole, we conclude that Mrs. Tharp's identification testimony satisfies the *Higgins* test and the identification of appellant as the robber was for the jury. Therefore, we hold the trial court did not err in denying appellant's motion for judgment of acquittal at the close of all of the evidence.

Appellant's next Point Relied On is that the trial court erred in overruling his motion to suppress identification testimony

and receiving into evidence State's Exhibit No. 9, a mug shot of the appellant.

Appellant argues that the lineup is the fruit of the poisonous tree because appellant was arrested in his home without a warrant, in violation of his Fourth Amendment guarantees, conveyed to the police station, held overnight, and compelled to appear in the line-up where he was identified by Mrs. Tharp.

The state contends the evidence of the pre-trial confrontation was not required to be suppressed because the identification evidence would have been obtained even if the arrest was illegal. In support of its position the State relies on *United States v. Jarvis,* 560 F.2d 494 (1977) cert. denied 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978) and *United States v. Alvarez-Porras,* 643 F.2d 54 (2nd Cir.1981).

We consider this Point in two stages. Initially, the denial of appellant's motion to suppress Mrs. Tharp's line-up identification and her eye-witness identification be excluded from the trial of the case on the grounds that he was illegally arrested in his home without a warrant and while in custody following this arrest was placed in a line-up where she identified him; that the circumstances of the line-up were so suggestive and prejudicial as to create a substantial possibility of irreparable misidentification, and thereby tainted her ability to make an accurate and unbiased in-court identification.

Appellant's Motion for New Trial allegations of error refer only to the denial of his Motion to Suppress State's Exhibit No. 9— the photograph of the post-arrest line-up. There is no reference anywhere in said Motion for New Trial to any error in overruling his motion to suppress the identification testimony of Mrs. Tharp relative to the line-up itself. Therefore, this portion of the Point Relied On preserves nothing for review with respect to her testimony concerning the post-arrest line-up itself. Rule 29.-11(d).

However, we now move on to a consideration of the trial court's admission into evidence of the photograph of the post-arrest line-up.

The evidence establishes that Mrs. Tharp had viewed a photograph of the appellant the afternoon of the robbery and informed the police officer that the picture resembled the person who robbed Mateker's Market earlier that morning. She was not positive in her identification; "I did the best I could."

The police armed with Mrs. Tharp's identification, went to appellant's apartment several times and finally, at approximately 11:45 p.m. the night of December 29, 1980, arrested him in his home without a warrant.

At the evidentiary hearing on appellant's motion to suppress identification appellant's counsel conceded that the thrust of his motion to suppress was against the line-up identification of appellant by Mrs. Tharp as the robber, not the in-court identification testimony of this witness.

After the evidentiary hearing the trial court found that the line-up was not suggestive; that there was an independent basis for an in-court identification by Mrs. Tharp, i.e. "her (Mrs. Tharp's) opportunity to view the person she thinks is the robber at the time of the robbery." Although requested to make a finding as to the legality of the arrest, the court declined to do so.

The question preserved for appellate review is the admissibility into evidence of the photograph of the line-up conducted after appellant was arrested in his home without a warrant.

At trial, Mrs. Tharp testified in detail concerning the line-up without objection, identified Exhibit No. 9 as a picture of the line-up she attended almost two weeks after the robbery, and pointed out that Mr. Mayes' sideburns and goatee displayed in Exhibit No. 9 were shorter than were those on the robber on the date of the robbery.

Appellant relies on *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) for the proposition that an arrest warrant is a necessary prerequisite for the police to invade a citizen's home for the purpose of arresting him; otherwise, such an arrest is a violation of the Fourth and

Fourteenth Amendments to the United States Constitution, and requires the suppression of any evidence, including identification, resulting therefrom.

He also cites *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) as authority for the proposition that pre-trial identification obtained through the use of a photograph taken during an accused's illegal detention following an arrest violative of the accused's Fourth Amendment rights must be suppressed as the fruit of the poisonous tree.

The State responds and argues that the motion to suppress the pre-trial identification was properly denied because (1) probable cause existed for appellant's arrest since Mrs. Tharp had previously identified appellant to the police from a series of photographs shown to her on the date of the robbery and (2) the identification evidence would have been obtained whether or not the arrest was illegal. *United States v. Jarvis,* 560 F.2d 494 (1977), cert. denied 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978).[5]

■ Because this arrest took place in appellant's home without a warrant, the holding in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) that a warrantless, non-consensual entry into a suspect's home to make a routine felony arrest is violative of the suspect's Fourth Amendment rights, even where the police officers have assembled evidence sufficient to establish probable cause that a crime has been committed and the person sought was the one who committed the crime, is controlling. *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 236[21] (Mo. banc 1982).

It follows then that the photograph of said line-up obtained during this illegal detention was suppressible as the fruit of the poisonous tree unless the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as

to remove the "taint" imposed upon that evidence.

■ There can be no question that the photo of the line-up was the fruit of the constitutionally defective arrest of the appellant, following closely his being taken into custody. The chain of causation proceeding from the unlawful conduct had not become so attenuated nor interrupted by some intervening circumstances so as to remove the taint resulting from the warrantless arrest.

■ The question remains whether the "inevitable discovery" exception to the exclusionary rule should be applied under the circumstances of this case. This exception to the exclusionary rule, initially espoused in *Somer v. United States,* 138 F.2d 790, 792[2] (2nd Cir.1943), and employed in *State v. Byrne,* 595 S.W.2d 301, 305[1] (Mo.App. 1979) cert. denied by 449 U.S. 951, 101 S.Ct. 355, 66 L.Ed. at 215 (1980), by this court, holds that illegally obtained evidence is admissible if the State can prove that the evidence inevitably would have been acquired without the illegal police conduct.

In *Byrne,* supra, a defendant was asked at the time of his arrest, and while suffering from a gunshot wound, where the gun he had used in a murder and attempted robbery could be found. The defendant responded, "Under a cookie dish," and the officer went to a nearby table, raised a cake pan, and discovered a .357 magnum gun. The trial court sustained defendant's statements obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) but denied his motion to suppress the product of these statements— the handgun found under the cake cover.

Conceding that neither the United States Supreme Court nor the Supreme Court of Missouri had expressly accepted this exception to the exclusionary rule, this court adopted the rule only, however, where the state had proved by clear and convincing evidence that (1) the state would have ac-

---

5. The parties to this appeal have neither argued nor briefed whether the warrantless arrest was justified on any other grounds or whether admissibility of this photograph was proper under

any of the other recognized exceptions to the exclusionary rule and we do not therefore, consider said exceptions in reaching our decision.

quired the evidence through legal means regardless of illegality and (2) the police officer involved did not act in bad faith to accelerate the discovery of the evidence.

In *State v. Hunter*, 625 S.W.2d 682, 684[1] (Mo.App.1981) this court cited *Byrne* and approved the admission into evidence of a set of the defendant's fingerprints obtained under a court order subsequent to suppression of an earlier set of fingerprints obtained while the accused was in custody pursuant to warrants issued out of three municipalities for defendant's arrest.

Neither *Byrne* nor *Hunter* involve a warrantless invasion of a suspect's home for the purpose of affecting his arrest, however, and are not, therefore, controlling here. *Byrne* was not in his home at the time he was placed under arrest, but had forced his way into the home of another seeking to make good his escape from the scene of the murder and attempted robbery. The police were attracted to the house because they'd learned that a request for an ambulance had been made from that address and suspected the injured person at that address to be the culprit. Other circumstances supporting this suspicion was the proximity of the house to the scene of the crime and a tracking by two dogs from blood found at the scene to the rear of the house where defendant was arrested.

As previously stated the *Hunter* case was not involved with the question of a warrantless arrest of a suspect in his home.

While we believe the police officers had probable cause to arrest appellant—information that a robbery had been committed and identification of appellant from an array of photographs as the robber, *State v. Tomlin*, 467 S.W.2d 918, 919[3–5] (Mo.1971) —nevertheless they made no effort to obtain a warrant for his arrest over a period of seventeen days and entered his home without a warrant to effect his arrest.

The Supreme Court of the United States in *Payton*, 445 U.S. at p. 586, 100 S.Ct. at p. 1380 said, "it is a 'basic principle of Fourth Amendment law' that searches *and* seizures inside a home without a warrant are presumptively unreasonable," (Emphasis supplied). Also, at p. 590, 100 S.Ct. at p. 1382, the Supreme Court said, "In terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."

When appellant's evidence demonstrated the warrantless invasion of his home during the evidentiary hearing on his motion to suppress, the burden shifted to the State to justify the admissibility of said evidence under an exception to the general rule. *State v. Olds*, 603 S.W.2d 501, 506[4] (Mo. banc 1980). The State made no effort to show that the photograph of said line-up would have inevitably been obtained without the constitutionally infirm warrantless arrest. Subject only to carefully drawn exceptions, warrantless intrusions into one's home are per se unreasonable and unconstitutional, and in order to militate against any rationalizing away of these protections, the burden of proving the existence of sufficiently exceptional circumstances is placed squarely on the shoulders of the State, and this is particularly so when there is ample opportunity to obtain a warrant.

We hold, therefore that the trial court erred in admitting into evidence the photograph of the line-up, State's Exhibit No. 9.

We must now consider whether the admission of this exhibit and its examination by the jury constitutes prejudicial error under the circumstances of this case.

Harmless error is not grounds for reversal; however, error in the admission of evidence should not be declared harmless unless it is so without question. *State v. Wright*, 582 S.W.2d 275, 277[2] (Mo. banc 1979).

Error in the admission of evidence in a case where the evidence of defendant's guilt is overwhelming might not be prejudicial; however, where as here, the evidence of guilt depends upon the testimony of a single eye-witness, whose description of appellant's height and weight varied at trial and in her description given to the police following the robbery, we cannot say that

error in admission of the line-up photograph was harmless.

We find this particularly so here because two of the eye-witnesses to the robbery failed to identify the appellant as the robber when an array of photographs were shown them, at the line-up or at trial. The evidence demonstrated that they had as good, if not better, an opportunity to observe the robber as did Mrs. Tharp.

 While the use of this photo to bolster Mrs. Tharp's identification testimony would ordinarily be proper, *State v. Quinn,* 594 S.W.2d 599, 603[9] (Mo. banc 1980), where the photo is the product of an unconstitutional arrest, it should not have been admitted into evidence and passed to the jury for examination.

Therefore, since we cannot find this error harmless, we reverse appellant's conviction and remand the case to the trial court for a new trial with directions to set aside its order denying appellant's motion to suppress the photograph of the line-up, State's Exhibit No. 9, and enter a new order consistent with what has been said in this decision.

Appellant's next Point, that the trial court erred in refusing his proffered Instruction A—an instruction on misidentification—we find to have no merit. This question has already been ruled adversely to appellant's contention. *State v. Quinn,* 594 S.W.2d 599, 605[12] (Mo. banc 1980); *State v. Holmes,* 622 S.W.2d 358, 361–362[5] (Mo.App.1981).

Appellant's final Point, is that the trial court erred in striking three jurors because during voir dire examination they responded to questions directed to them that they would be unable to consider a penalty of life imprisonment, a punishment within the range specified for this crime. §§ 569.020 and 558.011.1(1) V.A.M.S. Because this question could arise on retrial we invite appellant's attention to *State v. Mercer,* 618 S.W.2d 1, 7[1] (Mo. banc 1981) and *State v. Fenton,* 628 S.W.2d 706, 708[3] (Mo. App.1982), and hold that the trial court did not err in excusing the jurors.

Judgment reversed and remanded to the trial court for a new trial.

PUDLOWSKI, P.J., and SMITH, J., concur.