**STATE of Missouri,
Plaintiff-Respondent,**

v.

**John L. SANDERS, Defendant-Appellant.**

**No. WD 32032.**

Missouri Court of Appeals,
Western District.

Sept. 1, 1981.

James W. Fletcher, Public Defender, Sean D. O'Brien, Asst. Public Defender, Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Nancy J. Appelquist, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before MANFORD, P. J., and DIXON and NUGENT, JJ.

DIXON, Judge.

Defendant appeals his conviction for rape and first degree robbery. Consecutive sentences of 25 years for rape and 22 years for robbery were imposed.

Defendant challenges the identification testimony of the victim and asserts that hearsay evidence was improperly admitted. The convictions are affirmed.

The defendant does not challenge the sufficiency of the evidence, but some statement of the facts is necessary for a disposition of the identification issue. The victim was home on the morning of October 26, 1978, when she received a telephone call from a man seeking to return some shirts belonging to her boyfriend, Stephen. She agreed to accept the shirts, and later, about 10:00 to 10:30 a. m., a man came to her door. She viewed him through the peephole and decided not to respond to his knock. About twenty or thirty minutes later, she received a second call and again agreed to accept the shirts.

About 11:00 a. m., she met a man outside her apartment building. He handed her a box and attempted to give her some pills for Stephen to sell. At first she refused, but he prevailed on her to accept the pills. He then asked to use the telephone to confirm the transaction. When she discovered that no other telephone was available nearby, she admitted him to her apartment because she thought he was a friend of Stephen.

The victim opened the box, found one shirt, and looked up to see the man pointing a gun at her. He put her children in a closet, tied her to the bed, and raped her. After taking $40 in cash, her wallet, a digital clock, a camera, and some clothing, the assailant left. Except while he tied her to the bed, the assailant held a gun throughout the episode. She freed herself and her children and called the police. They found her "very upset." They took her to a hospital for examination. That evening, a police

officer presented five photographs for her to view. She selected defendant as the culprit and in December, 1978, identified the defendant in a three-man lineup.

Defendant asserts that both the photographic array and the lineup were impermissibly suggestive and, therefore, the in-court and out-of-court identification should have been suppressed.

The evidence concerning the identifications fails to support the allegations of suggestiveness. About six hours after the rape and robbery, the victim viewed photographs of five Negro males. Defendant was already a suspect, and the array consisted of his photograph and those of four others selected on the basis of similar facial characteristics, such as eyes, nose, and hair. The police officer said nothing except to preface the presentation with a reminder to look at basic facial features and to discount variables such as facial hair. The victim had described her attacker as wearing a full beard. Only the photograph of defendant showed a man with a full beard; however, one showed a man with a mustache and a goatee as well as the shadow of a full beard. One other photograph showed a man with a mustache and "some sort of chin whiskers." These facts arise from testimony; the photographic exhibits have not been filed in this court.

Defendant argues that only his photograph showed a man with a full beard. Actually, three showed men with at least some facial hair, and the police officer's caveat to disregard facial hair would tend to neutralize any imbalance in photographic identification.

The victim was not shown simultaneously an "array" of these photographs. The victim said that she was given a "stack" of photographs and looked at them one at a time. When she reached the third photograph, that of the defendant, she made the identification.

Persistently, defendant raises issues centering upon claims of suggestiveness in confrontations prior to in-court identifications. Invariably, as in the instant case, such claims are based upon a claim that some superficial distinction between the suspect and the other images or persons in the confrontation raises a question of suggestiveness.

The conduct of any sort of identification process is suggestive to the witness being requested to make an identification. Any rational person requested to view either a group of photographs or a lineup knows that there is *some* belief that the persons sought might be included in the group viewed. To that extent, any such procedure may be suggestive. It is only when such identification procedures become so suggestive that a substantial risk arises that a misidentification will occur that they become suspect.

The focus of an inquiry as to suggestiveness becomes a detailed examination of the circumstances of the process. This examination relates both to the objects of the confrontation—either the nature of the photographic images or the physical attributes of those in the lineup—as well as the conditions under which the identification occurs which will include any communications to the witness from those conducting the proceeding.

Considering first the persons involved in the confrontations, true look-alikes are not required. Paradoxically, true look-alikes might induce either misidentification of a person known to be innocent or produce an uncertainty of identification by the victim, thus destroying the whole value of the identification process. What is required to eliminate any taint of suggestiveness is a group of persons who share some commonality with the suspect in terms of the features relied upon by everyone for purposes of recognition of another person. The physical attributes not subject to alteration are of primary importance. Such physical attributes as size, sex, race, coloration, and general facial characteristics are such primary factors. Secondary to these factors are indicia of identification subject to alteration such as glasses, hair styles, both facial and otherwise, as well as clothing. Despite their secondary importance, such attributes as hair style, facial hair, or clothing might

create suggestiveness, but only when, viewed in the whole context of the confrontation whether photographic or in person, they constitute the only focal point for identification. Put in the affirmative, the confrontation should require the witness to consider the basic similarities in physical attributes so that the identification rests upon a normal recognition process and not a superficial elimination of all but the suspect as being totally unlike the person identified.

It must be recognized that in some circumstances an abnormality or distinctive appearance may inhere in the defendant and no photographic array or lineup can provide subjects reasonably close in appearance. In such circumstances, the likelihood of misidentification may be nonexistent regardless of the circumstances of the confrontation.

It must also be recognized that, even when a conscious effort is made to select individuals or photographs with similar physical attributes, there will be differences. If there were not, there would be no basis for any eyewitness identification. It is the distinction between individuals that makes identification possible. Identification—recognition of another individual—is a merger of recollection and physical observation. Recognition of another individual occurs when the recollection of previous observation matches present observation. Everyone recognizes the phenomenon of temporary misidentification. Almost everyone has experienced the momentary embarrassment occasioned by speaking to someone who, as it ensues, is a complete stranger. The function of the law then is to prevent that common human failing of casual identification from becoming the turning point in a criminal conviction.

To that end, the law has emphasized the importance of an in-court identification and its factual basis as the critical inquiry. The expression that "reliability is the linchpin of admissibility" recognizes the possibility of casual misidentification and insists upon examination of the ultimate issues of identification in the light of any claim of suggestiveness induced by a prior confrontation.

■ Thus, in considering the out-of-court identifications, a two-step analysis is required. *State v. Higgins*, 592 S.W.2d 151, 159 (Mo.1979). First, the police procedures are to be considered to determine if they are impermissibly suggestive. Second, if they are found to be impermissibly suggestive, then the inquiry turns to the reliability of the in-court identification. In determining reliability, the court looks at the "totality of the circumstances" including:

(1) The opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Higgins, supra* at 160.

The real importance of the suggestiveness of out-of-court identifications arises in the evaluation of the in-court identification. The question is the nexus between any claimed suggestiveness and the factors of reliability. Rarely will that nexus be so complete as to require the eyewitness identification to be removed from the jury's consideration. Normally, the issue will be one for the fact finder and ordinarily a matter for cross-examination to test the reliability of the in-court identification by calling the jury's attention to the suggestibility of the original identification process.

■ Applying this analysis to the instant case, nothing appears in appellant's claims of suggestiveness that would require exclusion of the identification.

There is no doubt that the evidence demonstrated reliability as to four of the five factors. The witness had ample time to observe. There was a high level of certainty in each of the identifications. There was no significant time lapse which might have affected the ability to identify. There are some inconsistencies between the initial description and the physical characteristics of the defendant. The defendant is two or three inches shorter than her original de-

scription. He has neither a round face nor a dark complexion. The victim also told police the attacker wore sunglasses which she denied in court.

None of these claimed discrepancies are affected or related to the claim of suggestiveness made as to the original photographic array or the subsequent lineup. Defendant does not claim that there was any element of suggestiveness in those confrontations which induced the victim to identify someone with the physical characteristics of the defendant as related by the victim. Only the beard she described so qualifies, and the officer pointedly cautioned the victim to disregard the presence or absence of facial hair as a basis for identification. The conduct or comments by those conducting or present at the confrontation are not involved in this case, for the only comment as noted above tended to eliminate rather than induce a suggestive atmosphere. The court did not err in the admission of the victim's identifications of the defendant.

In his second point, the defendant contends the court erred in admitting the victim's testimony that the telephone caller identified himself as "John," which is also defendant's given name. This argument presupposes that the court admitted the testimony, an assumption which the transcript contradicts. Early in the trial, the prosecutor asked, "About what time did you receive the phone call?" The victim responded, "The first call was a little after I had sent the kids off to school, and it was from John." Out of the hearing of the jury, defense counsel objected for failure to lay a sufficient foundation and moved for a mistrial. The prosecutor countered that "the State does not intend to show that this defendant is the one that made the phone call, only that she received a phone call from a person and that it explains her later actions." After a four-page colloquy, the court overruled the objection and denied the motion; *however*, the court did instruct the jury to disregard the voluntary statement as to the identity of the caller. The testimony was not formally admitted. *State v. Petrik*, 550 S.W.2d 613, 615 (Mo. App.1977).

■ The issue is the propriety of the refusal to grant a mistrial. Mistrial is a remedy of last resort. *State v. Ross*, 606 S.W.2d 416, 421 (Mo.App.1980). When a witness unexpectedly volunteers an inadmissible statement,

> the nature of the action called for rests largely within the discretion of the trial court. Granting a mistrial is a drastic remedy, and the trial judge has a duty to evaluate the whole situation to ascertain whether some other remedy short of that will cure the error. The appellate court reviews that decision only to verify that there has been no abuse of discretion.

*State v. Walker*, 531 S.W.2d 55, 57 (Mo.App. 1975). In the instant case, the court instructed the jury to disregard the statement, and counsel thereafter avoided the issue of the caller's identity. No abuse of discretion appears.

The judgment is affirmed.

All concur.