James Michael ARMOUR, Movant-Appellant,

v.

STATE of Missouri, Respondent-Respondent.

No. 52573.

Missouri Court of Appeals, Eastern District, Division Two.

Oct. 6, 1987.

Motion for Rehearing and/or Transfer Denied Nov. 18, 1987.

Application to Transfer Denied Jan. 20, 1988.

---

**684**

James S. McKay, St. Louis, for movant-appellant.

William L. Webster, Atty. Gen., Scott Templeton, Asst. Atty. Gen., Jefferson City, for respondent-respondent.

REINHARD, Judge.

Movant appeals the denial of his Rule 27.26 motion following an evidentiary hearing. We affirm.

Movant initially was charged with two counts of capital murder and one count of first-degree robbery. As the result of a plea bargain, the state reduced the capital murder charges to two counts of first-degree (felony) murder, movant entered pleas of guilty to the robbery and amended murder charges, and the court ordered a presentence investigation. Because the presentence investigation report contained comments by movant which indicated he denied his guilt, the court refused to accept the pleas. Movant then entered an Alford plea,[1] and the court sentenced him to three concurrent terms of life imprisonment in accordance with the plea agreement.

Movant filed a pro se Rule 27.26 motion, amended following appointment of counsel, and the motion court held an evidentiary hearing. In denying the motion, the court issued findings of fact and conclusions of law. The court found that counsel was not ineffective and that movant suffered no prejudice.

In his sole point on appeal, movant alleges

> The [motion] court was clearly erroneous in denying [movant's] claim of ineffective assistance of counsel under Rule 27.26 because the preponderance of evidence in the court below clearly established that [movant's] attorney made insufficient efforts to contact or produce two witnesses who could have supported [movant's] defense that he had not participated in the murders with which he was charged, and faced with such failure, the voluntariness of [movant's] guilty pleas was tainted.

From his original and amended motion and his point relied on, we perceive movant's contention to be that his counsel, Jo-

---

1. A guilty plea entered by a defendant who disclaims his guilt but pleads guilty to avoid the more severe punishment that might result from a trial. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

seph Downey, was ineffective because he failed to investigate two witnesses whose names were supplied to counsel by movant, and, as a result of counsel's ineffectiveness, movant, relying on the recommendation of counsel, entered an involuntary Alford plea.

On December 22, 1979, movant was charged with two counts of capital murder and one count of first-degree robbery. Following plea negotiations, movant appeared before Judge Robert Lee Campbell of the Circuit Court of St. Louis County on November 12, 1980, and pled guilty to one count of first-degree robbery and the amended charges of two counts of felony murder.[2]

The record indicates that prior to entry of movant's pleas, the prosecutor stated for the record what the state's evidence against him would be.

[PROSECUTOR]: Your Honor, the allegations involve two murders that occurred on the 19th of December of last year. The male victim is Derrick Richardson, was shot to death and he was also robbed. His body was found with the pockets turned inside out.

The State's evidence would be two weapons were used to shoot the man. He was also—there had been a struggle with Sonya Lathion and was also murdered. She had been beaten up and a cord had been tied with her hands behind her back and legs tied and the ligature also went around her neck.

She was found drowned in the bathtub in the same apartment where Derrick was found. A witness, who is the victim of Count III, robbery, who was from downstairs, a neighbor, came up and was met by two men, a man he knew who he identified as [movant] and another man.

Someone opened the door, the other man pushed him in the apartment and [movant] shut the door behind the man after he entered. The other man told him to empty out his pockets, which he did. And, the man was told not look at the two men. [Movant] and the other man left right after that and the victim's money was never recovered.

The State's evidence would be that [movant's] fingerprints or thumb print—palm print, was found in the apartment on the tile in the bathroom above where the body of Sonya was found in the bathtub. The State's evidence would be this is consistent with leaning against the tile for support while pushing someone in the bathtub, about the level of the bathtub.

The State's evidence would further be [movant's] fingerprints were found on a cup in the kitchen area of the apartment. [Movant] made numerous statements to both the police and to the victim's brother whom he knew.

The evidence will be [movant] knew both victims, [movant] on occasion had been seen with them. [Movant] denied having been in the apartment, however his fingerprints were found in those positions I told you.

[Movant] also alleged that he had been afraid of the other man. That the State's evidence would be the two men where together on numerous occasions after the murder and the first residence [movant] called after he was arrested was that of the codefendant. [Movant] was arrested approximately three days after the murders.

Movant said he understood the charges against him and admitted he was at the apartment when the killings occurred. The transcript then continues:

THE COURT: Did you get some of the money out of the robbery?

A. No.

THE COURT: What did you get out of the robbery?

A. I didn't get anything.

THE COURT: What was taken at the time, what was taken from the scene? What did you and the other fellow take?

A. I have to answer that?

THE COURT: Yes, please.

A. Money and television.

**2.** Movant originally was charged under § 565.001, RSMo 1978 (repealed 1983); under the amended information he was charged with violating § 565.003, RSMo 1978 (repealed 1983).

THE COURT: You took part in the robbery; is that correct?

A. Yes.

THE COURT: But, the main thing is, you are entering pleas of guilty because you are guilty; is that correct?

A. Yes.

The court advised movant of his rights, including trial by jury, and movant said he understood his rights and that, by pleading guilty, he was giving up those rights. After accepting the guilty pleas, Judge Campbell ordered the presentence investigation from the Board of Probation and Parole. The board's report contained this statement: "[Movant] stated that he was very drunk and laying around and didn't help [co-defendant Ronald Kendricks] with the killings. He added, I promised not to tell for some of the money from the robbery, therefore, I am as guilty as the person who committed the murder." At a December 11, 1980, meeting with movant's attorney, Judge Campbell said he could not "accept a plea of guilty and enter sentence on the pleas, as taken." He said he understood that movant wanted to enter an Alford plea and stated he desired "a better record if Mr. Armour ... wants the pleas to stand."

On December 18, 1980, movant again appeared before Judge Campbell who read into the record the equivocal statement from the presentence investigation report and then asked movant,

[h]as it been explained to you that merely receiving money from the robbery does not make you guilty of the murder; do you understand that?

A. I understand.

THE COURT: Do you wish to withdraw your plea of guilty and go to trial?

A. No.

The court then reminded movant of his right to a jury trial, and movant admitted that he had an opportunity to discuss with his attorney all the state's evidence, including the fingerprint evidence and the statement of the victim of the second robbery in which the victim identified movant as one of his robbers and as having been at the scene of the murders and robbery of Rich-ardson. The court then questioned movant:

THE COURT: Now, in view of all of this evidence, is your feeling, after discussing this with Mr. Downey, that a jury might well convict you of capital murder?

A. Yes.

THE COURT: And, is that why you want to plead guilty to felony murder?

A. Yes.

THE COURT: And, you want to plead guilty and take three concurrent life sentences with a right of parole at any time the parole board determined; is that correct?

A. Yes.

THE COURT: And, you want to do that rather than take a chance of a life sentence without parole or probation for fifty years or even possibly get the death penalty; is that correct?

A. Yes.

THE COURT: Mr. Downey, have you explained all of this to Mr. Armour?

MR. DOWNEY: Yes, sir. Mr. Armour and I specifically had talked about the provisions of an Alford plea long before he ever entered the plea of guilty. And I have gone over that with him again between the last time he was in court and this morning. And I believe that his desire, ever since the original plea of guilty is the same as it is today, to avoid the possibility of a much worse sentence in exchange for this lesser charge.

THE COURT: You do not wish to withdraw your plea of guilty today; is that correct?

A. No.

THE COURT: You understand, though, that rather than be sentenced today you would—I would permit you to withdraw these pleas and go to trial; do you understand that.

A. I understand it.

The court, in accordance with the plea bargain, then sentenced movant to three concurrent life sentences.

At the motion hearing, the court had available to it a record of the entire plea proceedings, including the initial guilty

pleas, and the testimony of movant, Sylvia Horton, and attorney Downey. Movant stated he had met with Downey about six times and he admitted that he had discussed with him the charges, the state's evidence, and any evidence that he might have on his own behalf. He said he gave Downey the names of "a few" witnesses and that he could remember two: Felita Rodgers and Sylvia Horton. Asked about Ms. Rodgers's knowledge, he said she had no direct knowledge of the incident itself but that she saw him shortly after and she would be able to testify that his clothes were not wet. Movant admitted that he was present when the two victims were killed and that he received money from the robbery of Richardson. He also admitted he robbed the downstairs neighbor, Louis McMorise, who said he saw movant and co-defendant leaving the apartment. He agreed that the evidence and the potentially more severe sentences "were factors that we took" into consideration in pleading guilty.

Ms. Horton, whose name apparently was in the police report, said she had known movant since high school and got acquainted with the co-defendant, Ronald Kendricks, through movant. On December 19, 1979, the evening of the murders, Kendricks arrived at her house. She said his clothes were "wet at the bottom ... his pants, they were wet." She said Kendricks was "excited" and that he said he had killed two people in an apartment in Berkeley. Kendricks told her that movant was present at the scene of the killings and that movant had robbed someone as they were leaving. When asked, "Did [Kendricks] say [movant] was involved in the killing at all?" she answered, "No, he didn't." She admitted on cross-examination that Kendricks had given her a knife and told her to hide it. He told her "that he tried to use the knife that night." She "guessed" that he had tried to use it to stab someone.

Downey testified that movant's first statement to police was that on the night of the murders he was nowhere near the apartment where the killings occurred and that he gave police the names of "a couple" of alibi witnesses. Movant then made an-other statement to police in which he said that he was forced at gunpoint by Kendricks to participate in the crimes. Downey said the problem with the coercion defense as he saw it was

that the downstairs neighbor who came up and interrupted what had happened because there was water dripping from the bathtub into his apartment, I took that man's deposition. That was Louis McMorise. And I was trying to show, I was trying to see if anything that he said could lend to my theory that James was forced into doing what he was doing and I didn't, didn't really feel good about my ability to convey that to a jury after taking his deposition. Nothing that he said sounded to me like a jury could conclude from it that James had like force—was forced into closing the door behind him, for example, once he was in the apartment. I mean, I certainly had some shot, I think, but I was not very confident.

. . . .

The thing was that by Mr. McMorise's testimony, the other defendant, Kendricks, was certainly far enough away from the door that if James had been doing anything out of fear, he could have easily run out the door or at least I felt very confident that [the prosecutor] was going to argue that to the jury.

Downey said that he talked to the attorney for Kendricks and "there would have been substantial problems if I had even used him, with the statements that he [Kendricks] had made." Downey remembered that in June 1980 movant had given him the name of Sylvia Horton as a potential witness. He testified that "all [movant] told me was she had—that Kendricks had admitted to her that he solely was responsible." Downey said that he attempted to telephone Ms. Horton but could not remember if he had talked to her. He said the name of Felita Rodgers did not appear in his file and he did not remember her name being given to him by movant.

The motion court concluded that movant did not establish that Downey's representation had been ineffective or that he had

been prejudiced and, therefore, denied the Rule 27.26 motion.

Our review is limited to determining whether the findings, conclusions, and judgment of the motion court are clearly erroneous. Rule 27.26(j); *Richardson v. State*, 719 S.W.2d 912, 915 (Mo.App.1986). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves the appellate court with a definite and firm impression that a mistake has been made. *Richardson*, 719 S.W.2d at 915. The motion court is not required to believe movant's testimony at a Rule 27.26 hearing, and an appellate court is required to defer to the motion court's determination of credibility. After a plea of guilty, the effectiveness of counsel is relevant only to the extent it affects the voluntariness of the plea. *Porter v. State*, 678 S.W.2d 2, 3 (Mo.App.1984). Movant has the burden of proving his asserted grounds for relief by a preponderance of the evidence. *Careaga v. State*, 613 S.W.2d 863, 867 (Mo.App.1981).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that in order to have a conviction or death sentence set aside on a claim of ineffective assistance of counsel, a convicted defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant. 104 S.Ct. at 2064. *Strickland* goes beyond the Court's previous pronouncements in that it held that a motion court may proceed directly to the issue of prejudice without first determining whether counsel's conduct was deficient. 104 S.Ct. at 2069; *Richardson*, 719 S.W.2d at 915.

Subsequent to *Strickland*, the Court in *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), dealt with an allegation of ineffective assistance of counsel in the context of a guilty plea. In concluding that the *Strickland* rationale is relevant to cases involving guilty pleas, the Court stated:

> The long standing test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative

courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970).... Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

....

Although our decision in *Strickland v. Washington* dealt with the claim of ineffective assistance of counsel in a capital sentencing proceeding, and was premised in part on the similarity between such a proceeding and the usual criminal trial, the same two-part standard seems to us applicable to ineffective assistance claims arising out of the plea process.

....

We hold, therefore, that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson*, [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)] and *McMann v. Richardson, supra*. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence,

the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.... [T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decision maker."

*Hill,* 106 S.Ct. 369–71 (footnote omitted).

 We believe the record supports the motion court's finding that movant's counsel was not ineffective. Movant's claim of ineffective assistance relates to counsel's failure to investigate the potential testimony of Ms. Rodgers and Ms. Horton. Downey said he was unaware of Ms. Rodgers and the motion court apparently believed him. *See Porter,* 678 S.W.2d at 3. Downey admitted movant had told him about Ms. Horton. However, we do not believe the failure to interview Ms. Horton constituted ineffective assistance of counsel. Counsel has a duty to make a reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary. A decision to forego investigation must be evaluated for reasonableness under the circumstances, all the while giving great deference to counsel's judgment. *Strickland,* 104 S.Ct. at 2066; *Richardson,* 719 S.W.2d at 915. Movant had told counsel that co-defendant Kendricks had admitted to Ms. Horton that he (Kendricks) was solely responsible for the killings. However, we do not read Ms. Horton's testimony at the motion hearing to be that Kendricks affirmatively stated that movant did not participate in the killings. Based upon the record before us, we believe that had Ms. Horton been a witness for movant at trial, her hearsay testimony would have been inadmissible, *see State v. Turner,* 623 S.W.2d 4, 8–9 (Mo. banc 1981),

and movant's counsel had already determined he could not use Kendricks at trial.

In any event we conclude that the record supports the motion court's finding that movant was not prejudiced. In light of the strong evidence by the state against movant, movant's inconsistent statements, the testimony of Ms. Horton cast in its most favorable light, and accepting as true movant's claim about Ms. Rodgers's testimony, we do not believe that movant has shown that there is a reasonable probability that, but for counsel's alleged errors, he would not have pled guilty and would have insisted on going to trial. To paraphrase *Hill,* would the testimony of Ms. Rodgers and Ms. Horton likely have changed the outcome of a trial? We do not believe that discovery of the purported evidence from Ms. Rodgers and Ms. Horton would have affected counsel's recommendation that movant enter the Alford plea.[3]

The motion court's findings, conclusions, and judgment were not clearly erroneous.

Judgment affirmed.

DOWD, P.J., and GARY M. GAERTNER, J., concur.

---

**3.** In light of *Strickland* and *Hill,* it is now evident how important it is to make a proper record at guilty plea proceedings. The state should place into the record the details of its evidence and the strengths of its case. Defense counsel should place into the record any defense shortcomings which affect their determination to recommend a plea of guilty.