STATE of Missouri,
Plaintiff/Respondent

v.

Earl THOMAS, Defendant/Appellant.

Earl THOMAS, Movant/Appellant,

v.

STATE of Missouri,
Respondent/Respondent.

Nos. 56754, 60065.

Missouri Court of Appeals,
Eastern District,
Division One.

May 5, 1992.

John Klosterman, Public Defender, St. Louis, Melinda K. Pendergraph, Public Defender, Columbia, for defendant/appellant.

William L. Webster, Atty. Gen., Rudolph R. Rhodes, IV, Asst. Atty. Gen., Jefferson City, for plaintiff/respondent.

REINHARD, Presiding Judge.

Defendant appeals his convictions and sentences for multiple counts of forcible rape, kidnapping, and robbery and for one count of attempted robbery. He also appeals the denial of postconviction relief following an evidentiary hearing. We affirm.

Defendant was convicted by a jury of five counts of forcible rape, § 566.030, RSMo 1986; five counts of kidnapping, § 565.110, RSMo 1986; four counts of first-degree robbery, § 569.020, RSMo 1986; and one count of attempted first-degree

robbery, § 564.011, RSMo 1986. He was sentenced by the court as a prior, persistent and class X offender[1] to 99 years imprisonment on each of the rape counts and three of the first-degree robbery counts and to 30 years imprisonment on each of the kidnapping counts, one of the robbery counts and the attempted robbery count. The sentences were ordered to run consecutively for a total of 1,002 years imprisonment. Defendant appealed.

After filing the record on appeal, defendant filed a *pro se* Rule 29.15 motion alleging ineffective assistance of counsel. Appointed counsel filed an amended motion and a request for an evidentiary hearing, which was granted. Following the evidentiary hearing, the motion court issued findings of fact, conclusions of law and an order denying the motion. Defendant appealed and the cases were consolidated.

On April 21, 1987, defendant approached Diane at a bus shelter at St. Louis Avenue and Belt in north St. Louis at approximately 5:00 a.m. while she was waiting for the bus to go to work. He put a gun to her head and ordered her to follow him. Defendant said the police were looking for him and if someone was with him they wouldn't bother him. He said if she didn't get up and go with him, he would blow her head off. Defendant asked her if she had any money; she gave him $3.00. Defendant took her across a vacant lot to a backyard in an alley and told her to take off her clothes. She asked why and he told her it was so that she wouldn't follow him. She protested that she wouldn't follow him, but he ordered her to take them off anyway. He then raped her. Afterwards, he went into her purse and asked if she had any more money. He said if she did or if he found any more money in the purse, he was going to kill her. Finding none, he left.

On May 3, 1987, defendant approached Bessie from behind as she was crossing the intersection of Cote Brilliante and Arlington in north St. Louis at 5:30 a.m. on her

1. Defendant had previous convictions for sodomy, attempted sodomy, assault with intent to ravish with malice, first-degree robbery, second- degree burglary, stealing, and operating a motor vehicle without permission.

way to catch the bus to work. Defendant had a gun and ordered her to keep walking and not to say anything. He told her if she said anything, it "wouldn't mean nothing to him to blow my brains out." Defendant took her to a vacant lot and ordered her to give him the money in her purse. She told him how much she had—approximately $5.00. He said if he found any more, he would blow her brains out.

Defendant took Bessie from the lot into an alley. He walked her up and down the alley looking for a spot. Finally, he took her to a vacant house on Semple. He had her stand outside the door and ordered her to undress. He then told her to step inside and raped her, keeping the gun to her head the entire time. Defendant wore a shower cap during the rape. Afterwards, he told her not to leave until he was gone.

On May 11, 1987, defendant approached Lisa from behind as she walked to a bus stop at the intersection of Kingshighway and Lillian in north St. Louis at approximately 5:30 a.m. He had a gun and told her not to say anything or look around or he was going to shoot or kill her. Defendant told her to walk into some bushes. He asked her if she had any money; she said, "Yes" and gave him about $4.00. He told her if she had any more and he found out, he was going to shoot her. He ordered her to take her clothes off. She kept looking at him. He told her not to look at him, but she kept doing so. She took her clothes off and laid down on the ground as he ordered. Defendant raped her and told her not to move until he was out of sight.

On June 25, 1987, defendant approached Marion while she walked towards a bus stop in north St. Louis at approximately 6:30 a.m. As she walked, she noticed a man "sort of like jogging" out of an alley. She kept on walking. When she looked up again, he was in her face pointing a gun. He said, "Bitch, if you make any noise, I'll blow your brains out." He then took her by the arm and walked her back towards the alley. As he did so, she noticed a gray watch on his arm with "Gatorade" and cardinal birds on it. Defendant wore a

green shower cap and high-top tennis shoes.

Defendant asked Marion if she had any money. She said no, all she had was a bus pass. He told her if she was lying, he would kill her. Defendant took her bus pass. He then took her into the alley and walked her around in circles until he could find a place to take her. Eventually, he took her to the back of a vacant building and hoisted her through a back door. Once inside, he ordered her to take off her clothes and lie down on a couch. He then raped her. Marion was pregnant at the time.

On June 30, 1987, defendant approached 15-year-old Angela as she walked to her bus stop at the corner of Thomas and Garrison in north St. Louis at approximately 6:35 a.m. Angela saw defendant come around the corner onto Thomas. He was jogging on the other side of the street. As she neared the corner, defendant walked towards her. He had a gun and told her if she said anything or screamed, he would blow her brains out. He ordered her to walk with him back up Thomas. Defendant told her to turn on a corner lot at Thomas and Elliot. He told Angela he needed money to get to work and he would leave her alone. She told him she didn't have any money and not to hurt her. He told her to climb up into a vacant house so he could get away. She did so and kept looking at him. He kept telling her if she turned and looked, he would blow her brains all over the wall. Defendant took her into another room of the house. Angela kept looking at him. Defendant told her to take her clothes off so he knew she couldn't follow him. As she did so, he left the room but returned and asked her how old she was. He then made her take off her underwear, which she had left on. He took a clear plastic cap out of his pocket and put it on his head. He made her lie down on her stomach on some blankets and attempted to penetrate her anally. He then moved her to another room and raped her. Angela was a virgin prior to the rape.

On July 15, 1987, Angela spotted defendant driving down her street in an orange

Gremlin. She ran into her house and told her mother, who called police. Meanwhile, her young nephew rode his bike after the car and copied the first three letters of the license plate, "HLN."

Two pairs of officers assigned to the sex crimes unit responded to the call. Detective Right and Detective Noble heard an all-points bulletin broadcast while in the office and checked some printouts, which revealed that an orange Gremlin with license plate number "HLN502" belonged to defendant.[2] Detective Right recalled previously interviewing defendant and that he lived at his girlfriend's apartment in the Cochran Garden Apartments. The pair responded to the Cochran Garden Apartments and found an orange Gremlin with the license plate number "HLN502" in the parking lot. Detective Noble put her hand on the hood and found the engine was still warm. They used their radio to request that the officers who had picked up Angela bring her to the scene. They did so. Angela identified the car as the one she had seen her assailant driving.

Officers took Angela to the police station, where she picked defendant out of a photo spread containing six photos. Officers subsequently approached defendant in his girlfriend's apartment at Cochran Garden Apartments. When asked, he stated that he owned the orange Gremlin. Defendant was arrested and read his rights. The detectives seized a pair of high-top USA Olympic tennis shoes which he was wearing. They also seized a digital watch with the St. Louis Cardinals logo on the top and the Gatorade logo on the bottom from defendant's person while conducting an inventory search at the station. Defendant gave a signed consent to search the orange Gremlin. Inside the car, they found a shower cap.

All five victims were subsequently brought to the police station to view a lineup that night and the next morning. Angela, Lisa, and Diane identified the de-

fendant in separate lineups as the man who had raped, robbed or attempted to rob, and kidnapped them. Bessie testified that she spotted defendant in the lineup and recognized him as the perpetrator but became too emotionally distraught and afraid to identify anyone the night of the lineup. When police brought a photo of the lineup to her house two days later, she identified defendant. Marion was unable to make an identification. All five victims identified defendant as the perpetrator at trial.

The State presented testimony from Joseph Crow, a criminologist for the St. Louis Metropolitan Police Department for 14 years with a degree in chemistry and graduate courses in forensic serology. Crow analyzed rape kits from each of the victims and found human spermatozoa in vaginal swabs and samples from the crotch area of the panties of all five victims, as well as in an anal smear from Bessie.

Crow also testified that he drew two blood samples from defendant. His analysis showed that the defendant has type B blood, which is characteristic of 21.51% of the U.S. black population. Crow's analysis of Angela's blood and saliva[3] revealed that she has type AB blood. Examination of Diane's saliva revealed that she has type O blood. Analysis of Lisa's saliva revealed she is type B. Marion was determined to be type O.

Analysis of Angela's panties revealed the presence of the B antigen, as did analysis of the vaginal swab and panties of Diane, Bessie and Lisa and analysis of the vaginal swab of Marion. Crow testified that all of this evidence was consistent with the victims having had sexual intercourse with defendant.

Crow also analyzed a shoe imprint left at the scene of Marion's rape and compared it with a USA Olympic tennis shoe seized from defendant. He testified that the size of the two shoes was identical. Furthermore, analysis of three wear marks showed that the wear marks were in the same

2. At trial, the State entered into evidence records of the Missouri Department of Revenue showing that this license plate was registered to defendant.

3. Crow testified that saliva samples will reveal blood type in 80% of the population. In the remaining 20%, the results will be blank as to blood type.

general area on the imprint as they were on defendant's shoe and that the shoe which left the imprint had been worn the same amount of time as the shoe which was seized from defendant.

In addition, the State presented medical and expert testimony about a "DNA fingerprinting" test which linked defendant to the rape of Marion. The test was performed by Lifecodes corporation of Valhalla, New York.

The court held a hearing outside the presence of the jury to determine the admissibility of scientific and expert testimony relating to the test prior to its being presented to the jury. At the hearing, Dr. Joseph Hoffman, director of biochemical genetics at Cardinal Glennon Hospital, testified as a neutral expert witness. Dr. Hoffman testified that the procedure used by Lifecodes is the standard technique and is a process and procedure that is generally accepted as accurate and reliable in the scientific community.[4] The court found that the practice is accepted in the scientific community and that evidence of the test was admissible as reliable and relevant to the determination of who was the perpetrator of the acts involved in the case.

At trial, Lisa Bennett, a forensic scientist at Lifecodes whose primary function is to perform the DNA fingerprinting test[5], testified extensively concerning the testing procedures and quality control checks used by Lifecodes in this case. Ms. Bennett testified that DNA contained in sperm removed from Marion's panties matched DNA obtained from defendant's blood. Ms. Bennett further testified that the finding was 99.99% certain and that the only possibility of unreliability in the test would be that attributable to human error.[6] The pattern found would match only one in 87,000 North American blacks.[7]

Dr. Ivan Balays, director of clinical services at Lifecodes, testified that he had published forty to fifty scientific articles in journals dealing with genetics and microbiology. He testified that the process used by Lifecodes to extract DNA and come to a final pattern for forensic identification purposes is generally accepted as reliable and accurate in the scientific community. Dr. Balays testified that the probability of a match between the samples on both the blood type (B) and DNA fingerprint would be one in 435,000, plus or minus 10–20%. He further testified that the likelihood that the DNA found in Marion's panties came from defendant was higher than 99.99%.

Defense counsel's cross-examination of the three witnesses who testified about the DNA fingerprinting procedure spanned 25 pages of the trial transcript. He renewed his objection to the admissibility of the results of the DNA examination of defendant and the semen stain evidence found on Marion's panties at trial. The court overruled the objection.

■■ Defendant presented no evidence at trial. On appeal, he contends that the trial court erred in overruling his motions to suppress the eyewitness identifications. Defendant claims that the pretrial identifications by Diane, Bessie, Lisa and Angela

were impermissibly suggestive in that the police conducted a lineup at which all the alleged victims appeared together at a lineup [sic], conducted overnight, to which police called each alleged victim and numerous other alleged victims. The impermissibly suggestive procedure rendered the witness' [sic] subsequent trial identifications of [defendant] unreliable under the totality of the circumstances test.

---

4. This process is described in greater detail in *People v. Wesley*, 140 Misc.2d 306, 533 N.Y.S.2d 643 (Co.Ct.1988). *See also State v. Davis*, 814 S.W.2d 593, 598–99 (Mo. banc 1991).

5. Ms. Bennett testified that she has a bachelor of science degree in biology, has been employed at Lifecodes for three years, and has performed this test in well over two hundred cases. She has testified about her findings in seven states.

6. Ms. Bennett testified on cross-examination that the process is more reliable than traditional fingerprinting processes.

7. Ms. Bennett testified that Lifecodes had seen this pattern only once in 87,000 North American black people. It is believed that no two people have the same DNA pattern.

In considering the admissibility of identification evidence allegedly resulting from suggestive pretrial procedures, we first determine whether the police procedures were impermissibly suggestive. *State v. Hutchinson*, 740 S.W.2d 184, 186 (Mo.App. 1987). If they are found to be impermissibly suggestive, the inquiry turns to the reliability of the in-court identification. *Id.* In determining reliability, the court looks at the "totality of the circumstances" including the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Id.* at 186–87; *State v. Sanders*, 621 S.W.2d 386, 389 (Mo.App. 1981).

■ In this case, however, the point was not properly preserved for review. Although defendant's motions to suppress were denied following a pretrial hearing, defendant failed to object to any of the evidence of pretrial identifications and to the in-court identifications by the same witnesses at trial. Defendant's motion for new trial contains merely a conclusory allegation that "[t]he out of court identification testimony of the victims [was erroneously admitted] because the identifications were made in violation of the defendant's constitutional rights[.]" We thus review only for plain error resulting in manifest injustice. Rule 30.20. We have reviewed the entire record and, in light of the strength of the State's case, find that no manifest injustice resulted from admission of the identification testimony.

■ Moreover, admission of the evidence was not error. Defendant's point appears to be based upon the assumption that the victims had the opportunity to consult with each other prior to making the identifications. There is no support whatsoever in the record for such an assumption. On the contrary, Detective Noble testified that before the victims viewed the lineups, "we had a lot of detectives in the lunch room to keep [the victims] from talking about what

was going on." After they viewed the lineup, "we had a detective walk out with them and take them directly home so that they couldn't talk with the other witnesses." Defendant was placed in different positions in different lineups and the witnesses viewed the lineups over a two-day period. The procedures were not impermissibly suggestive. Point denied. Defendant's convictions and sentences are affirmed.

■ In an appeal from the denial of post-conviction relief, our review is limited to determining whether the findings, conclusions, and judgment of the motion court are clearly erroneous. Rule 29.15(j); *Brummell v. State*, 770 S.W.2d 379, 380 (Mo.App.1989). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves the appellate court with a definite and firm impression that a mistake has been made. *Id.* The movant has the burden of proving his asserted grounds for relief by a preponderance of the evidence. *Armour v. State*, 741 S.W.2d 683, 688 (Mo.App.1987).

Defendant's sole point on appeal from the denial of his Rule 29.15 motion contends the motion court clearly erred in denying relief and finding that he had received effective assistance of counsel

> because the record clearly refutes the motion court's finding that counsel had adequately investigated [defendant's] defense without consulting a genetics expert or thoroughly familiarizing himself with relevant legal authority on Lifecodes [sic] statistical methods in that counsel's testimony at the evidentiary hearing revealed that he was not aware of cases that rejected DNA fingerprinting testimony from Lifecodes company as not statistically valid.

To prevail on an ineffective assistance of counsel claim, defendant must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Cook v. State*, 752 S.W.2d 483, 485 (Mo.App.1988), *citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This is a heavy burden and trial counsel, afforded

broad latitude as to questions of trial strategy, is not to be judged ineffective constitutionally simply because in retrospect such a decision may seem an error in judgment. *State v. Davis,* 814 S.W.2d 593, 603 (Mo. banc 1991). In resolving such a claim, we may proceed directly to the issue of prejudice. *Cook* at 485.

In his amended motion, defendant's only claim of ineffective assistance of counsel regarding the DNA issue was that counsel had not raised foundational objections to the testimony of Dr. Hoffman at the admissibility hearing.[8] The prejudice alleged was that the evidence was admitted whereas it might not have been had he done so and that defendant was limited to the plain error standard of review on appeal.[9]

The motion court found that trial counsel had "reviewed the evidence in regard to the DNA testing and attempted to find an expert witness to discredit the testing procedures and methods but was unable to locate anyone who would challenge the technique." The court concluded as a matter of law that defendant had failed to show that there was merit to this allegation and that the actions of counsel "with regard to the DNA evidence fall within the realm of trial strategy."

After reviewing the entire record, we are not convinced that the motion court's findings are clearly erroneous. *See State v. Davis,* 814 S.W.2d at 603–04. Defense counsel conducted a vigorous cross-examination of all three witnesses who testified about the DNA fingerprinting procedure and evidence, challenging in particular the applicability of Dr. Hoffman's expertise. *See id.* He also sought, albeit unsuccessfully, an expert witness who would challenge the procedure. *Id.*

Moreover, defendant suffered no prejudice. The DNA evidence pertained only to the counts involving Marion. The other evidence on these counts was overwhelming, including Marion's in-court identification of defendant; her description of the watch found on defendant's person; the shower cap found in defendant's car; the evidence of the shoe imprint at the scene which matched defendant's shoe in size, amount of wear, and location of three separate wear marks; and the presence of defendant's blood type in her vaginal swab shortly after the crime.

Defendant has therefore failed to carry his heavy burden of demonstrating a prejudicially deficient breach of trial counsel's broad latitude as to questions of trial strategy. *Davis* at 603. Nor are we left with a definite and firm impression that a mistake has been made. *Brummell* at 380. Point denied.[10]

Judgments affirmed.

GARY M. GAERTNER and CRANE, JJ., concur.

---

8. *State v. Davis,* 814 S.W.2d 593, would seem to defeat such a claim where, as here, it is based on the expert's lack of firsthand familiarity with the tests. *See id.* at 602–03. In *Davis,* the Missouri Supreme Court held that the scientific theory underlying DNA typing is not controversial and argument concerning the manner in which the tests are conducted goes more to the credibility of the witnesses and the weight of the evidence, which is in the first instance a discretionary call for the trial court. *Id.* It is within the trial court's sound discretion to admit or exclude an expert's testimony. *Id.* In the present case, Dr. Hoffman testified that he performed similar procedures, albeit for a different purpose, and was familiar with the technique involved. The record reveals that defendant's counsel conducted a vigorous cross-examination

as to Dr. Hoffman's qualifications to apply his knowledge to the testing mode at issue.

9. The latter injury is not cognizable in a Rule 29.15 proceeding, as the motion court correctly found. *Kirk v. State,* 778 S.W.2d 661 (Mo.App. 1989).

10. On appeal defendant cites the New York case of *People v. Wesley,* 140 Misc.2d 306, 533 N.Y.S.2d 643 (Co.Ct.1988) for the proposition that Lifecodes' conclusions about DNA evidence are of questionable statistical validity. This issue was not raised in his motion. *Wesley* approved the use of Lifecodes' DNA fingerprint tests for identification purposes. *Id.* 533 N.Y.S.2d at 659. The court did limit the power of identity that could be claimed in that trial to

a mean power of 1 in 140 million for American Blacks and 1 in 84 million for Caucasoids. *Id.* However, it took that action based upon specific expert testimony at the pretrial hearing. The ruling permitted a much greater claim of reliability than was claimed at the instant trial, wherein the State claimed a figure of 1 in 87,000 for North American blacks. *See also State v.*

*Davis,* 814 S.W.2d at 601. *But see People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (Sup. Ct.1989).